IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAWAD BHATTI,<br><br>Defendant. | Case No. 3:25-cr-99-REP |

### UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Try as he might, defendant cannot succeed in dismissing ten counts of the indictment, and in seeking to strike certain background sections of the Indictment because they are inaccurate or irrelevant. Defendant's main argument, that the Court should strike Counts 1-3, relies almost entirely on a non-precedential case vacated 25 years ago, a fact defendant conveniently did not disclose to the Court in his motion. He misunderstands the regulatory scheme, claiming that a key statutory concept does not exist and faults the Indictment for discussing it, but the error is his. He also asserts that the Court should immediately decide, on a motion to dismiss, a factual dispute exclusively reserved to the jury. Because the Court cannot accept defendant's incongruities and errors, it should deny the motion to dismiss.

### Factual Background

Defendant is a Richmond-based pain management doctor that was charged via Indictment on June 17, 2025. The Indictment alleges two main schemes: 1) a scheme to inject patients with toxic and misbranded ozone gas mixed with lidocaine, with the ozone gas produced by adulterated and misbranded ozone machines defendant imported from outside the United States, falsely billing Medicare and Medicaid for such injections, and creating false medical records to cover up the scheme; and 2) falsely billing Medicare and Medicaid for

1

using an ultrasound to guide the injection of a needle when in fact either no machine was used—or if it was used, it was used outside requirements—and creating false medical records to cover up the scheme.

Defendant's alleged fraud was both dangerous and costly: some of defendant's patients reported that the injections containing ozone gas caused them the worst pain they had ever experienced, and defendant's intended loss to government health care programs was over $5.2 million.

## Legal Standard

A federal indictment must contain the elements of the offense charged, fairly inform defendant of the charge, and include enough information to enable the defendant to claim double jeopardy in future prosecutions for the same offense. *United States v. Kingrea*, 573 F.3d 186, 191 (4th Cir. 2009).

When considering a motion to dismiss, "the indictment allegations are presumed to be true, and the motion should not ordinarily be used as a vehicle to test the sufficiency of the evidence behind the allegations." *United States v. Treacy*, 677 F. App'x 869, 873 (4th Cir. 2017). A defendant must therefore "demonstrate that the allegations [in the indictment], even if true, would not state an offense." *United States v. Thomas*, 367 F.3d 194, 197 (4th Cir. 2004). "The district court may dismiss an indictment before trial based upon 'an infirmity of law,' but not based upon a determination of facts that will be developed at trial." *United States v. Castro-Aleman*, 2023 WL 4937304, at *2 (E.D. Va. Aug. 2, 2023) (citation omitted).

Further, in interpreting and applying the statute at issue for most of the ozone claims —the Food, Drug, and Cosmetic Act (FDCA)—courts should remember that "the high purpose of the [FDCA is] to protect consumers who under present conditions are largely

unable to protect themselves in this field." *Kordel v. United States*, 335 U.S. 345, 349 (1948); *United States v. Article of Drug (Bacto-Unidisk)*, 394 U.S. 784, 798 (1969) ("remedial legislation such as the Food, Drug and Cosmetic Act is to be given a liberal construction consistent with the Act's overriding purpose to protect the public health."); *see also United States v. Undetermined Quantities of an Article of Veterinary Drug*, 22 F.3d 235, 238 (10th Cir. 1994).

## Argument

### A. Using or Offering to Use an Adulterated and Misbranded Medical Device on a Patient After that Device has Moved in Interstate Commerce Satisfies § 331(c).

Th grand jury charged defendant with, inter alia, three counts of violating 21 U.S.C. § 331(c), which makes it a crime to receive in interstate commerce a device that is adulterated or misbranded, "and the delivery or proffered delivery thereof for pay or otherwise." 21 U.S.C. § 331(c). Defendant argues that these counts must be dismissed because his using the adulterated and misbranded devices to produce a drug that he injected into patients does not constitute "delivery" and the indictment is lacking an essential element. Def. Brief at 3.

Defendant alleges that the indictment is missing the element "delivery or proffered delivery" and, further, that dismissal is warranted because "provision of medical services to a patient does not equate with a delivery." Def. Brief at 3. Defendant is correct that there is little caselaw[1] on § 331(c), but courts interpreting related FDCA prohibited acts have overwhelmingly found that medical professionals providing medical services to a patient falls within the proscriptions of the FDCA. *See, e.g.*, *United States v. Jackson*, 126 F.4th 847, 860 (4th Cir. 2025) (holding adulterated devices for sale is not protected by "practice of medicine"

---

[1] Defendant mainly cites *United States v. Barnett*, 2000 Dist. LEXIS 9677, 2000 WL 968775 (S.D.N.Y. July 12, 2000), which was vacated on April 10, 2001. Defendant failed to inform the Court that the main case on which he relies has long been vacated.

3

exceptions to provisions of the FDCA); *United States v. Kaplan*, 836 F.3d 1199, 1208 (9th Cir. 2016) (FDCA covers the physician's use of a device on patients).[2]

The Supreme Court has long recognized that the FDCA is "designed primarily to protect consumers from dangerous products" and applies to articles "from the moment of their introduction into interstate commerce all the way to the moment of their delivery to the ultimate consumer." *United States v. Sullivan*, 332 U.S. 689, 696 (1948). To that end, the Court has explained that the FDCA must be read broadly. *Id*. at 694 (broadly interpreting the meaning of the "interstate commerce" requirement in § 331(k)); *see also United States v. Dotterweich*,[3] 320 U.S. 277, 280 (1943) (interpreting FDCA's strict liability criminal penalties).

The Supreme Court's decision in *Sullivan* provides helpful context for understanding the scope of § 331 and its subdivisions. In *Sullivan,* a retail druggist in Columbus, Georgia was charged with violating 21 U.S.C. § 33l(k) after he bought properly labeled drugs from an Atlanta consignee that had bought it from a laboratory in Chicago, Illinois. The druggist then placed the tablets in pill boxes that did not contain the statutorily required warnings or adequate directions for use and then sold the boxes to customers. The court of appeals

---

[2]  *See also United States v. Regenerative Scis.*, LLC, 741 F.3d 1314 (D.C. Cir. 2014) (drug created by physicians in their practice and used to treat patients is subject to the FDCA); *United States v. Diapulse Corp of Am.*, 514 F.2d 1097, 1098 (2d Cir. 1975) (medical devices held by practitioners used on their patients are subject to the FDCA); *United States v. Evers*, 643 F.2d 1043, 1052 (2d Cir. 1975) (doctors holding drugs for use in their practice are clearly part of the distribution process and are subject to the FDCA); *United States v. Device Labeled "Cameron Spitler Ambylo- Syntonizer"*, 261 F. Supp. 243, 246 (D. Neb. 1966) (physician was not exempt from the requirements of the FDCA when he used misbranded devices in the treatment of his patients even though he did not sell the devices in the commercial sense).

[3]  In *Dotterweich*, the Supreme Court explained that "[t]he purposes of [the FDCA] thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection." 320 U.S. at 280. "Regard for these purposes" "should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words." *Id.*

reversed the conviction on the ground that section 33l(k) should not be construed to include misbranding by a person who did not himself receive the drug by way of a shipment in interstate commerce. *Id.* at 692. In other words, had the consignee misbranded the drugs, the appellate court would have permitted a § 331(k) charge against the consignee; a similar charge against the retailer, however, was impermissible because the sale between the consignee and the druggist was purely *intrastate*.

The Supreme Court reversed, holding that § 331(k) should be read broadly to effectuate the purposes of the FDCA and that the other prohibited acts alone "do not supply protection all the way to the consumer." *Id.* at 693, 696. Defendant reads *Sullivan* to indicate that § 331(k) is the only subsection of § 331 that protects consumers. Contrary to defendant's reading, the Supreme Court actually expanded the reach of the FDCA to include acts that misbrand the drugs *after* they moved in interstate commerce even where a defendant received them from an intrastate actor. The holding in no way limited the scope of § 331(c) to "transactions between distributors *before* the device or drug reaches the ultimate consumer." Def. Brief at 4. Indeed, the Fifth Circuit explained that § 331(k) was necessary for situations where the misbranding offender had no part in the interstate commerce: "The gap which section 301(k) [codified at 21 U.S.C. § 331] was designed to fill arises when a drug which has already been transported in interstate commerce is misbranded by a person who neither shipped nor received the drug in interstate commerce." *United States v. Evers*, 643 F.2d 1043, 1050 (5th Cir. 1981). But that is not the case here because defendant himself imported the ozone machines into the United States and delivered misbranded drugs to patients. Thus, the limitations defendant claims to derive from *Sullivan* are inapplicable to his case.

Rather, the Supreme Court recognized that the other prohibited acts, specifically

section 331(a) (introduction into interstate commerce of violative article), 331(b) (adulterating or misbranding the article in interstate commerce), and section 331(c) (receipt in interstate commerce and proffered delivery of a violative article) would not *alone* always supply protection to the consumer. *Id*. (emphasis added). The Court did not limit the interpretation of what constitutes delivery for section 331(c), but expanded the interpretation of what constitutes interstate commerce for section 331(k) to establish the maximum possible reach of the FDCA. Thus, *Sullivan* actually demonstrates the opposite point defendant claims. *Evers*, 643 F.2d at 1049 ("section 301 of the Act is designed to prevent misbranding at each stage of the distribution process.") (citing *Sullivan*, 332 U.S. at 696-97).

In any event, the vacated *Barnett* case on which defendant mostly relies erred in too narrowly circumscribing § 331(c)'s statutory language to exclude medical treatment in light of the broad remedial purpose of the FDCA. In determining the meaning of statutory text, "[w]e begin, as always, with the text of the statute." *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 197 (2007). "In interpreting statutory texts courts use the ordinary meaning of terms unless context requires a different result." *Gonzales v. Carhart*, 550 U.S. 124, 152 (2007).

The district court in *Barnett* claimed that the ordinary meaning of "deliver" did not encompass administering a substance as part of a medical treatment, citing only meanings of deliver "such as 'give' or 'transfer.'" 2000 WL 968775, at *2. But "deliver" cannot be so narrowly defined—Merriam-Webster offers many other definitions, at least one of which is applicable to administering treatment to a patient: "to send (something aimed or guided) to an intended target or destination." *Deliver*, merriam-webster.com/dictionary/deliver (last visited on October 3, 2025). Similarly, "deliver" is very commonly used in a medical context,

and a medical dictionary lists two definitions for delivery: delivering a baby, and "[t]he provision and administration of a therapeutic agent to a patient," which exactly describes a doctor injecting a substance into a patient. Taber's Medical Dictionary, tabers.com/tabersonline/view/Tabers-Dictionary/760231/all/delivery (last visited on October 3, 2025). Ignoring a common medical meaning in a statute aimed at the regulation of potentially harmful drugs, especially in the context of the "liberal construction" due the statute in light of its "overriding purpose to protect the public health," *Bacto-Unidisk*, 394 U.S. at 798, is only one of the errors made in *Barnett*. *See also Regenerative Scis., LLC*, 741 F.3d at 1320 ("Given Congress's intent that the FDCA's 'coverage be as broad as its literal language indicates,' such a construction is not tenable.") (quoting *Bacto-Unidisk*, 394 U.S. at 798). The Court should rely on the ordinary meaning of the statutory language and conclude that administering injections from adulterated and misbranded devices falls within the meaning of "delivery" in § 331(c).

In this case, the ozone machines are alleged to be adulterated and misbranded *before* they entered interstate commerce, to include at the time defendant received them for further use on his patients. Because the purpose of the FDCA is to cover every stage in the supply chain to the point the product is consumed, defendant's conduct violates § 331(c) because he received the unapproved device from an unregistered manufacturer and sold treatments using it. Section 331(k) does not apply because defendant did not cause the devices to become misbranded and adulterated; these acts occurred before the devices moved in interstate commerce.[4]

---

[4] The Indictment charges violations of § 331(c) in Counts 1-3 because that provision most closely matches the scope of defendant's conduct, but if the Court concludes that dismissal of

## B. Components of Defendant's Ozone and Lidocaine Shot Moved in Interstate Commerce and Thus Satisfy the Jurisdictional Element

Defendant also argues that Count 4 of the Indictment charging him violating § 331(k) of the FDCA is deficient and must be dismissed because "the drug was not shipped in interstate commerce." Def. Brief at 4. Although defendant's argument is not entirely clear, he states that "the article that was shipped" in interstate commerce, which he identifies as a device, needs to be "the same article that was allegedly misbranded," which he identifies as the ozone injection. *Id.* at 5.

Section 331(k) prohibits taking any action with respect to a regulated article "if such act is done while such article is held for sale . . . after shipment in interstate commerce and results in such article being adulterated or misbranded." 21 U.S.C. § 331(k). There is no requirement that the adulterated or misbranded article be further introduced into interstate commerce, and in fact that would be an additional violation under § 331(a).

Here, defendant was charged with misbranding a drug, specifically the ozone plus lidocaine injection that he prominently displayed on his website, by offering it for sale without a proper label after its components moved in interstate commerce. Defendant argues that "components" appears nowhere in the statute, Def. Brief at 5, but he is wrong because it appears in the statute as part of the definition of a drug, the regulated article charged here. 21 U.S.C. § 321(g)(1)(D).

Courts have consistently interpreted sections 331(k) and 321(g)(1)(D) to mean that the

---

the § 331(c) charges is required, defendant's victory would be short-lived because the United States could also charge defendant with violations under § 331(a), wherein defendant ordered the unapproved devices from an unregistered manufacturer and thereby caused it to be introduced into interstate commerce.

final drug product (here, the ozone plus lidocaine injection) need not have been shipped in interstate commerce in completed form to satisfy the requirement of prior shipment in interstate commerce and establish a predicate for a § 331(k) violation. *See*, *e.g.*, *Baker v. United States*, 932 F.2d 813, 814-15 (9th Cir. 1991) ("the 'shipment in interstate commerce' requirement is satisfied even when only an ingredient is transported interstate"); *United States v. Dianovin Pharms., Inc.*, 475 F.2d 100, 103 (1st Cir. 1973) ("appellants' use of components shipped in interstate commerce to make vitamin K for injection brought their activities within section 331(k), and conferred jurisdiction to restrain violations thereof upon the district court"). When one of a drug's components has been shipped in interstate commerce, manufacturing an article of drug from that component in a manner that renders the drug adulterated or misbranded in violation of § 331(k). *Dianovin Pharms.*, 475 F.2d at 103.

The government could meet its burden by showing that any of the components of the ozone and lidocaine shot moved in interstate commerce. The indictment need not identify which component moved in interstate commerce, but here, the lidocaine used as part of the injection mixture, and/or the oxygen defendant used to manufacture the ozone using his misbranded machines, travelled in interstate commerce. The Court should thus reject defendant's attempt to dismiss Count 4.

### C. Defendant's Disagreements with the Indictment's Factual Allegations Provide No Basis to Dismiss Counts 15-20

A motion to dismiss is not the appropriate avenue for a defendant to quibble with the factual allegations of an indictment; that is what trials are for. "The district court may dismiss an indictment before trial based upon 'an infirmity of law,' but not based upon a determination of facts that will be developed at trial." *United States v. Castro-Aleman*, 2023 WL

9

4937304, at *2 (E.D. Va. Aug. 2, 2023) (citing *United States v. Lewis*, 262 F. Supp. 3d 365, 368 (2017)).

Defendant appears to claim that counts 15-20 are subject to dismissal at this stage because the meaning of the Current Procedural Terminology (CPT) codes developed by the American Medical Association is a legal and not a factual question. He cites no support for this argument, and there is none, because determining whether a particular CPT code is properly applied to the facts of a case is a factual finding that is the province of the jury. *See, e.g., United States v. Elfenbein*, 144 F.4th 551, 567 (4th Cir. 2025) ("Reasonable people could indeed interpret the *CPT Manual* differently. But this is what juries are for."). In urging the Court to immediately rule on the meaning of a disputed medical rule, defendant seeks to short circuit the ongoing expert disclosure procedures the Court has outlined, ECF 30, and to have the Court take over the role of the jury based on a bare factual and legal record. The Court should summarily reject defendant's misguided attempt to dismiss counts 15-20.[5]

### D. The Court Need Not Strike Background Portions of the Indictment Defendant Claims are Irrelevant.[6]

Apparently intent on striking all portions of the Indictment unhelpful to his case,

---

[5] Nor does defendant's speculation that the grand jury was not properly instructed on his preferred interpretation of the CPT code change anything. The time for defendant to argue about the facts is at trial, not before the grand jury.

[6] Defendant calls these statements "inaccurate," Def. Brief at 7 ("The *Inaccurate* Statements of Law Incorporated into Counts 5-14 Should be Stricken"), but his argument is really that they are irrelevant.

Regardless, if the Court believes that any portion of the background section of the Indictment is inaccurate or irrelevant, it can simply offer jury instructions that either correct any shortcomings in the Indictment, or that instruct the jury to disregard any offending portion of the Indictment. Such a determination is best made during trial after the Court is familiar with the facts and law, not at this early juncture.

defendant also asks that the Court strike sections of the Indictment related to background information regarding how the government regulates unapproved or misbranded devices and drugs. Defendant cites no authority for this request other than a 50-year-old case that states the benign and well-understood proposition that jury instructions are within the Court's discretion. Def. Brief at 7. But the background sections of the Indictment are not jury instructions, and simply explaining a complicated area of the law in an attempt to offer a defendant information about why he is charged with a particular crime in no way encroaches on the jury instructions. Indeed, defendant faults the United States for complying with the mandate that "[a]n indictment must contain the elements of the offense charged, fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense." *Kingrea*, 573 F.3d at 191 (citation omitted).

Neither is it the case that the background information does not apply to defendant. For example, he cites paragraph 17 and claims the Indictment includes information about domestic manufacturers despite defendant not being such, Def. Brief at 7, but that paragraph outlines the importance of pre-market approval for medical devices, which is key because the Indictment charges defendant with receiving in interstate commerce medical devices that, in part, lacked pre-market approval. Indictment ¶ 60. Similarly, defendant claims paragraph 18 is irrelevant because it discusses foreign manufacturers, but that paragraph merely notes that even foreign manufacturers of medical devices must register with the FDA, which is important because the Indictment alleges defendant bought FDA-unapproved ozone machines from foreign manufacturers and used those machines unlawfully. Indictment ¶¶ 38-40, 59-60.

Lastly, defendant claims paragraph 24 is irrelevant because it discusses the

requirements a drug sponsor would have to undergo to demonstrate the safety and effectiveness of a new drug, and defendant did not undertake such efforts for his ozone treatments. But that is exactly the point. If defendant wanted to lawfully use treatments that FDA has said are out of bounds, there is an established procedure to do that. That defendant did not follow this established procedure, and instead used adulterated and misbranded devices to produce and administer misbranded drugs while lying about it as alleged, is highly relevant to the illegality of his conduct and to his mental state.[7]

Simply put, there is no basis to strike the background information in the Indictment that serves an important purpose in describing the regulatory background and offers defendant due process protections in fairly describing why his conduct is alleged to be unlawful.

---

[7] Defendant also claims in passing that the Indictment fails to allege scienter. Def. Brief at 5. First, he claims, without authority, that to violate the law he must have "specific intent to defraud or mislead regarding the misbranded or adulterated nature," but the "specific intent" element and that it must relate to the "misbranded or adulterated nature" is nowhere to be found in the statute. 21 U.S.C. § 333(a)(2) ("if any person . . . commits such a violation with the intent to defraud or mislead, such person shall be imprisoned for not more than three years. . ."); *United States v. Dessart*, 823 F.3d 395, 403 (7th Cir. 2016) ("the consensus among the circuits is that § 333(a)(2) applies if the defendant intended to deceive either consumers or the FDA or both."). The Indictment adequately alleges that defendant acted with the requisite intent to defraud or mislead. Indictment ¶¶ 54-56.

## CONCLUSION

The Court should deny defendant's motion because he fails to mee the legal standard for dismissal of any count. His motion is riddled with legal and factual inaccuracies, and he repeatedly asks the Court to prematurely decide issues or to take them out of the hands of the jury, where they properly belong.

LINDSEY HALLIGAN
UNITED STATES ATTORNEY


By:___/s/_____
Shea Matthew Gibbons
Virginia Bar No. 83916
Assistant United States Attorney
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, VA 23219
Ph: (804) 819-5400
Email: Shea.Gibbons@usdoj.gov
